In the

# United States Court of Appeals

For the Seventh Circuit

No. 05-1478

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JAMES SURA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-CR-218—**Randolph T. Randa**, *Chief Judge.*

ARGUED NOVEMBER 7, 2006—DECIDED DECEMBER 12, 2007*

Before EASTERBROOK, *Chief Judge,* and POSNER and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* James Sura owned a World War II
Beretta, which he kept in his home. As far as this record
reveals, Sura never attempted to use the gun, nor did he
own ammunition for it. Sura was, however, a convicted

---

* This opinion is being released in typescript. A
printed version will follow.

felon, and so when the Beretta was found in his home in 2003, he wound up in hot water, charged with being a felon unlawfully in possession of a firearm. See 18 U.S.C. § 922(g)(1). In early 2004, Sura agreed to plead guilty; his plea included a clause waiving his right to appeal his conviction and sentence. The district court accepted the plea and gave him a 30-month sentence. Sura now wants to challenge that sentence, but in order to do so, he first must convince us that his appeal waiver should be set aside. If he can do so, he would like to challenge the district court's application of the advisory Sentencing Guidelines, which call in § 2K2.1(b)(2) for a reduced sentence for a felon who possesses a firearm used solely for sporting or collection purposes.

Sura's primary argument proceeds on the assumption that we can perform surgery on his plea agreement, excising only paragraph 30, which contains the waiver of his right to appeal. But we have often held that this is not an option. See, *e.g., United States v. Lockwood,* 416 F.3d 604, 607 (7th Cir. 2005); *United States v. Cieslowski,* 410 F.3d 353, 363-64 (7th Cir. 2005); *United States v. Whitlow,* 287 F.3d 638, 640 (7th Cir. 2002). Sura asks in the alternative, however, to be relieved of the plea altogether, on the ground that he entered into it involuntarily. Approaching the appeal on the latter basis, as we must, we conclude that Sura has shown that he did not knowingly and voluntarily accept the plea (including its waiver of his appellate rights) and thus that the district court plainly erred when it accepted the plea. We therefore vacate the plea and remand this case to the district court for further proceedings.

# I

Until Sura turned 49, in 1982, he apparently had no run-ins with the law. Unfortunately, he seems to have undergone a Hyde-like change that year, when he began accumulating a string of convictions for sex offenses, including sexual assault, child enticement, and disorderly conduct. As of 2002, Sura was on probation. In July 2002,

Sura's probation officer searched his home and found a rifle, three shotguns, a Beretta pistol and ammunition. The guns were turned over to Sura's son, and Sura's probation officer warned him that he could not possess guns.

Disregarding this advice, Sura later retrieved the Beretta pistol, which was a souvenir that a friend had brought home after World War II and given to Sura in the 1950s. In 2003, police discovered the Beretta once again in Sura's possession. According to the government, the police searched Sura's home with his consent, locating the Beretta in the basement. (Sura claims that he delivered the gun to the police. This factual dispute has no bearing on our analysis here.)

In October 2003, Sura (by then almost 70 years old) was indicted for being a felon in possession of a firearm; he was charged only with possession of the Beretta. After negotiations with the government, he signed a plea agreement, under which he agreed to plead guilty but reserved the right to challenge the calculation of his sentence. As we noted earlier, the plea agreement included a waiver of all his appellate rights.

Whether the court properly accepted Sura's guilty plea lies at the heart of this appeal, and so we describe the court's inquiries under FED. R. CRIM. P. 11 in some detail. Initially, the court asked Sura if he was on any medication; Sura replied that he was. Following up, the court asked "would any of that medication affect your understanding of what's happening here today?" Sura replied ambiguously "I don't think so, sir. But I can't say for sure." Sura also told the court that he was undergoing psychological treatment. The court noted that Sura was represented by counsel, but the court did not ask Sura if his counsel had either reviewed the plea agreement or discussed his case with him. Instead, the court asked Sura only, "Are you satisfied with the representation that you have received from [your attorney]?" and "Are there any questions that you may have of [your attorney] at this point?" The court also asked

Sura "knowing the rights that you're giving up, and the penalties involved, is it still your wish and still your desire to enter a plea of guilty to this count," to which Sura replied, "Yes, sir." The court reiterated, "And are you doing that because that's what you want to do?" Sura replied, "That's a difficult question to answer, Your Honor. But I have to say yes. I do have a conviction of a felony on my record, I was in possession of the Beretta, so I have to plead guilty."

The court specifically asked Sura if he understood "that by signing the Plea Agreement that you're giving up the rights that are contained in the Plea Agreement," to which Sura replied, "Yes, sir." The court then listed some of those rights, including the right to a trial, the right to a jury, the standard of evidence at a trial, and the right to testify or remain silent at trial. It said nothing, however, about the waiver of appellate rights, thereby omitting a point specifically required by Rule 11(b)(1)(N). The court also asked whether "anyone has made any threats or promises to get you to do this . . . aside from what's contained in this Plea Agreement," and Sura replied, "No, sir."

At his sentencing hearing, Sura argued for the application of U.S.S.G. § 2K2.1(b)(2), which reduces the Guidelines offense level to a level 6 if a defendant is convicted of unlawful possession of a firearm but "possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition." Sura admitted that he knowingly broke the law by possessing the Beretta. He told the court, "I wish I could come before you and say this is all a mistake . . . [but] I did have the Beretta in my possession." But he explained,

Why did I have it? Something I've treasured for over 50 years. Something that some soldier actually carried into combat with him in World War II. I never looked at it as being a gun per se. Never owned any ammunition for it. I would have been afraid to fire it. I didn't even

know it worked until I was told that your people [police ballistics] had fired it.

The district court declined to apply the reduction to Sura's sentence. The court justified its refusal by noting that Sura had previously had his probation revoked "because of possession of firearms and ammunitions . . . [specifically] a sword, a hunting knife, bow and arrow set, [and] a hatchet." The court concluded that Sura's possession of the Beretta "follow[ed] a pattern of notice and repetition that makes it so –- at least elevates it from the harmless characterization made by the defense." The court further justified its decision by noting Sura's practice of groping women, concluding that "all periods of [Sura's supervised release or probation] have never been completed without . . . a subsequent violation." Using an offense level of 13 and a criminal history category of VI, the court calculated an advisory sentencing range of 33 to 41 months' imprisonment. Based primarily on the fact that Sura was 71 years old at the time of sentencing, the court, noting that the ultimate standard is reasonableness, imposed a below-Guidelines sentence of 30 months. (Had the court accepted Sura's argument for the use of § 2K2.1(b)(2), the offense level would have been 5 (base level 6 plus 2 for number of firearms, minus 3 for acceptance of responsibility); for someone like Sura in Criminal History Category VI, the recommended range would have been 9-15 months.) After the sentencing, Sura's trial lawyer properly filed Sura's notice of appeal; later, new counsel was appointed to represent Sura on appeal.

## II

### A

Because this appeal turns on the question whether Sura is entitled to have his guilty plea set aside, we begin by looking at FED. R. CRIM. P. 11, a "guilty-plea safeguard[]." *United States v. Ruiz*, 536 U.S. 622, 631 (2002). Rule 11 generally spells out the procedures that a district court must follow when a defendant wishes to plead guilty. It

exists "to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary . . . [and] to produce a complete record at the time the plea is entered of the factors relevant to this voluntariness determination." *McCarthy v. United States*, 394 U.S. 459, 465 (1969). "Thus, the more meticulously the Rule is adhered to, the more it tends to discourage, or at least to enable more expeditious disposition of, the numerous and often frivolous ... attacks on the constitutional validity of guilty pleas." *Id.*

On December 1, 1999, a new subsection was added to what was then Rule 11(c), "specifically to reflect the increasing practice of including provisions in plea agreements which require the defendant to waive certain appellate rights." Committee Note to the 1999 Amendments. As part of the Rules' overhaul in 2002, the amendment was relocated to Rule 11(b)(1)(N) as a "stylistic only" change. Committee Note to the 2002 Amendments.  Rule 11(b)(1)(N) was in force  at the time of Sura's guilty plea; it requires that the defendant be told by the court "the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." Rule 11(b)(1)(N). Rule 11(b) leaves no doubt that the court is required to touch upon all of the topics listed there. It says that before the court may accept a plea of guilty, "the court *must* address the defendant personally in open court," and that during this colloquy, "the court *must* inform the defendant of, and determine that the defendant understands," each item in the list that follows. *Id.* (emphasis added). Sura's sentencing took place on February 16, 2005, and so it is clear that the district court erred by failing to mention anything about the appellate waiver when it accepted the guilty plea.

Sura, however, never objected to this omission before the district court. Understandably enough, he argues that he did not become aware of the flawed Rule 11 process until he was examining his possible appeal. Even if the forfeiture is not surprising, however, the fact remains that he did not properly preserve this argument before the district court. In

*United States v. Vonn*, the Supreme Court held that forfeited objections to violations of Rule 11 must be reviewed like all other non-structural forfeited points: for plain error only. 535 U.S. 55, 59 (2002). Although there are some differences in detail between *Vonn* and our case, the Court's language leaves no doubt that it was speaking about all Rule 11 violations to which the defendant makes no objection, not just the particular one before it. *Id.*; see also *United States v. Murdock*, 398 F.3d 491, 496 (6th Cir. 2005) (relying on *Vonn* to apply plain error review to a plea agreement case regarding waiver of appellate rights). As the *Vonn* Court explained,

> [w]hen an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his "substantial rights" were affected. [*United States v.*] *Olano*, 507 U.S. [725,] 734-735 [(1993)]. And because relief on plain-error review is in the discretion of the reviewing court, a defendant has the further burden to persuade the court that the error "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 736 ... (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

535 U.S. at 62-63. Under *United States v. Dominguez Benitez*, 542 U.S. 74 (2004), Sura was "obliged to show a reasonable probability that, but for the [Rule 11] error, he would not have entered the plea." *Id.* at 76.

Before Rule 11 was amended, we had held in *United States v. Wenger,* 58 F.3d 280 (7th Cir. 1995), that a district judge's failure to address an appeal waiver during the Rule 11 colloquy did not warrant setting aside a plea agreement as involuntary. We noted particularly that "warnings about waivers of appeal are not to be found" in Rule 11, and that "Rule 11's value is as a formulary." *Id.* at 282. We also commented that "[i]f the [plea] agreement is voluntary, and taken in compliance with Rule 11, then the waiver of appeal

must be honored." *Id.* at 283. Since 1999, a plea taken in compliance with Rule 11 must include the very kind of specific alert to a waiver of the right to appeal that we noted was *not* required under the rule in 1995. The "formulary" has changed and it now requires more. Thus, the rationale of *Wenger* is consistent with a finding that because Sura's acceptance of the plea agreement was *not* taken in compliance with Rule 11, it also might not have been voluntary.

Since the addition of Rule 11(b)(1)(N), we have addressed it in four cases, but three of them were nonprecedential. The decision in *United States v. Loutos*, 383 F.3d 615 (7th Cir. 2004), is the only published opinion in which we have considered that section of the rule (or its 1999 predecessor). *Id.* at 617-18. In *Loutos,* however, the defendant objected to the omission and moved to withdraw his guilty plea, and so the question before us was whether the error was harmless, not whether it was plain. Nonetheless, the analysis of Rule 11 in *Loutos*, and in particular its treatment of waivers of appellate review, remains useful. *Loutos* first noted that "[t]he purpose of a Rule 11 colloquy is to expose coercion or mistake." *Id.* at 619. The court then observed that

> [t]he validity of a Rule 11 colloquy is based on the totality of the circumstances, including such factors as "the complexity of the charge, the defendant's level of intelligence, age, and education, whether the defendant was represented by counsel, the judge's inquiry during the plea hearing and the defendant's statements, as well as the evidence proffered by the government."

*Id.*, quoting *United States v. Blalock*, 321 F.3d 686, 688-89 (7th Cir. 2003).

In evaluating whether the defendant's guilty plea was valid "despite the district court's omission of a specific appellate waiver warning," we focused on the defendant's background. *Loutos*, 383 F.3d at 619. That defendant was particularly sophisticated: he was a practicing attorney with nearly four decades of legal experience and was

therefore "familiar with contracts and the need to carefully read documents that are contractual in nature and signed by the party." *Id.* This, in combination with the defendant's "acknowledg[ment] under oath that he understood the consequences of his guilty plea, that he had not been pressured or coerced to plead guilty, and that his plea was voluntary" led us to conclude the district court's omission was harmless. *Id.*

Following *Vonn* and *Loutos*, then, we must look to the totality of the circumstances surrounding the negotiation of Sura's plea agreement and the court's acceptance of the plea to determine whether the district court's failure to mention Sura's plea agreement waiver of appellate rights during the plea colloquy constitutes plain error. This includes evidence outside the Rule 11 colloquy. *Vonn,* 535 U.S. at 75. Throughout this process, as *Dominguez Benitez* emphasized, Sura bears the burden of proof. 542 U.S. at 82.

It is important, in this context, to recall that Sura is challenging the voluntariness of his plea agreement in an attempted direct appeal, not in a collateral proceeding. In *United States v. Timmreck,* 441 U.S. 780 (1979), the Court held that a defendant is not entitled to collateral relief from a conviction merely because Rule 11 may have been violated when his plea was accepted. *Id.* at 785. Importantly, the Court in *Timmreck* stressed that the respondent had not argued "that he was actually unaware of the special parole term or that, if he had been properly advised by the trial judge, he would not have pleaded guilty." *Id.* at 784. Sura, of course, now argues both those things: that although he may have read the plea agreement, he did not understand the meaning of the appeal waiver, and that he would not have pleaded guilty if he had. (He said nothing about the appeal waiver in particular during his plea colloquy; his comment about reading the agreement and discussing it with counsel referred to the agreement as a whole. The district court spent two pages of the plea colloquy explaining to Sura what rights he was waiving, but it was silent as to Sura's waiver of appellate rights.)

*Peguero v. United States,* 526 U.S. 23 (1999), while closer to Sura's case because it involved a failure to advise a defendant about his right to appeal, was also a case involving a collateral attack on a conviction under 28 U.S.C. § 2255. Once again, the record showed that the petitioner "had full knowledge of his right to appeal," and thus the Court found that he was not prejudiced by the omission. 526 U.S. at 28. *Timmreck* and *Peguero* reinforce the important point that Sura must do more than show that the Rule was technically violated. He must show that his guilty plea was involuntary and that he would not have entered it on the basis of the record as a whole, which is the inquiry this court followed in *Loutos.*

At least four other circuits have undertaken a post-*Vonn* plain error analysis in cases where the district court failed to mention the defendant's waiver of appellate rights when it went through the Rule 11 plea colloquy. These decisions demonstrate that "plain error" is not an automatic synonym for "no error." The Sixth Circuit, for example, found plain error where the defendant was not told about the waiver of appellate rights in his plea agreement during the Rule 11 colloquy and the record lacked any other indication of the defendant's specific knowledge of that waiver. *United States v. Murdock, supra,* 398 F.3d at 498-99. The court there relied on the record as a whole, acknowledging *Vonn* and stating that "[w]e emphasize that in the absence of an inquiry into the appellate waiver by the district court as required under the rule, some other event could suffice to insure that [a] defendant's waiver was knowing and voluntary." *Id.* at 497-98. The court gave as examples "a defendant . . . [who] assure[s] the district court that he has reviewed the waiver provision (or, at a bare minimum, the plea agreement) with his attorney and that his attorney has explained it" or a prosecutor "adequately address[ing] the waiver" in her summary of the plea agreement in the colloquy. *Id.* at 498. More recently, the Sixth Circuit upheld just such a waiver of appellate rights in a case where the prosecutor, and not the judge, pointed

out the waiver in the plea agreement during the colloquy. *United States v. Robinson*, 455 F.3d 602, 610 (6th Cir. 2006).

The Ninth Circuit found plain error in a case similar to *Murdock* where "the magistrate judge asked each defendant only the general questions whether they had read and understood their 'five or six-page plea agreement,' and made no specific reference to the waiver of the right to appeal the sentence." *United States v. Arellano-Gallegos*, 387 F.3d 794, 797 (9th Cir. 2004); see also *United States v. Alarid*, 123 Fed. Appx. 294, 295 (9th Cir 2006).

Like the Sixth Circuit, the Tenth has sometimes found plain error and sometimes not. In *United States v. Edgar*, the Tenth Circuit held that "[a] mere silent record does not satisfy [the defendant's] burden" that she did not knowingly and voluntarily waiver her appellate rights. 348 F.3d 867, 873 (10th Cir. 2003). The *Edgar* court looked to the plea agreement's plain language of waiver, the signature section of the agreement confirming that some rights are being waived knowingly, and the defendant's testimony during the colloquy that he had read and understood the agreement and had consulted with his attorney before signing it. *Id.* at 872. Based on that evidence, the court concluded that the waiver was voluntary and knowing, and thus there was no plain error, even though neither the court nor the prosecutor mentioned it during the colloquy. *Id.* at 873. Another Tenth Circuit decision three months earlier, in contrast, held that a court's statement to the defendant that he had "given up your right to appeal your sentence which you might otherwise have" was not adequate to inform him that he was barred from "any subsequent effort to seek modification of his sentence." *United States v. Chavez-Salais*, 337 F.3d 1170, 1174 (10th Cir. 2003).

Finally, in a nonprecedential order, the Fifth Circuit concluded that if the waiver is not mentioned during the arraignment, then "the waiver cannot be held to have been knowing and voluntary," without any additional analysis. *United States v. Rodriguez*, 98 Fed. Appx. 355, 356 (5th Cir.

2004); see also *United States v. Hoot*, 86 Fed. Appx. 16, 16 (5th Cir. 2004).

**B**

We find the Sixth Circuit's analysis in *Murdock* to be most helpful in resolving Sura's appeal. *Murdock* applies the well-established plain-error analysis to the precise question we now face; in so doing, it stresses the need to take the totality of the circumstances into account. In order to show plain error, the defendant must demonstrate that there is "'1) error, 2) that is plain, and 3) that affects substantial rights[; and if] all three conditions are met, an appellate court may exercise its discretion to notice a forfeited error, but only if 4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Murdock*, 398 F.3d at 496 (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997), which in turn summarizes *United States v. Olano,* 507 U.S. 725, 732-35 (1993)). See also, *e.g., United States v. Simpson,* 479 F.3d 492, 496 (7th Cir. 2007); *United States v. Nitch,* 477 F.3d 933, 935 (7th Cir. 2007).

As we noted earlier, there is no serious dispute that an error occurred here. Rule 11(b)(1)(N) requires the district court to inform the defendant during the plea colloquy of the waiver of appellate rights contained in the plea agreement and to ensure that the defendant understands the waiver. The district court did not do so. That was error, and the error was "plain" in the sense of the second part of the *Olano/Johnson* analysis. (Confusingly, the same term is used for the ultimate conclusion. We do not mean to say that plain error in the Rule 52 sense occurs every time advice is not given; the ultimate conclusion depends on all four parts of the required analysis.)

The third question is whether Sura's substantial rights were affected by the error. This is the element on which the Supreme Court focused in *Dominguez Benitez*. There the Court held that, in order to show that substantial rights were affected, the defendant "must show a reasonable

probability that, but for the error, he would not have entered the plea." 542 U.S. at 83. One step (although not the only step) along the way to the defendant's demonstration that the error affected his decision to plead guilty is to look at whether the defendant understood his plea agreement. The point of Rule 11(b)(1)(N) is that a signed piece of paper is not enough. Most criminal defendants are not legal experts, which is why Rule 11(b)(1)(N) puts a check in the system in the form of a requirement that the district court explain in plain language what consequences will flow from the guilty plea, including (where applicable) the loss of appellate rights. If the safeguard required by Rule 11 is missing, the record must reveal an adequate substitute for it, and the defendant must show why the omission made a difference to him.

When we look to the record in this case, we find nothing that suffices as an adequate substitute. Unlike the defendant in *Loutos*, Sura has no legal experience apart from his previous criminal convictions. The record gives us no indication whether in any of those earlier cases he waived his appellate rights, let alone whether he ever pleaded guilty using a written plea agreement. The district court did not ask Sura whether his attorney explained this part of the plea agreement to him, or even whether he reviewed the agreement with his attorney. The prosecutor did not interject and direct the court's attention to the waiver. The court listed several rights that Sura was waiving, but it confusingly omitted the right to appeal. Sura's explanation for why he accepted the plea agreement gives no assurance that he understood this aspect of the deal, and he now argues that he did not. The explanation suggests, in fact, that he may mistakenly have thought that he had to accept the agreement because he was willing to admit to his guilt, when in fact he could have pleaded guilty without a plea agreement.

Nothing we have said in any way undercuts the fact that we presume that statements made under oath during a plea colloquy are true. *United States v. Standiford*, 148 F.3d 864,

868 (7th Cir. 1998). Everything Sura told the district court during that exchange can be taken as true. The problem is that no one said anything about the waiver of appellate rights. It is this utter silence that causes the problem here. If we were to go further and assume that the waiver was knowing and voluntary based only on the facts that Sura (at the time 71 years old and undergoing mental health treatment) is literate and signed the agreement, we would render meaningless not only Rule 11(b)(1)(N), but also the broader inquiry into prejudice that the Supreme Court requires. Rule 11(b)(1)(N), or its equivalent for plain error purposes, exists precisely to ensure that the defendant actually knows what rights he is signing away. Here, the record does not reveal any substitute for the safeguards of Rule 11. We conclude that Sura's waiver of his appellate rights was not knowing and voluntary. Furthermore, in light of Sura's confused responses to the district judge's questions, his age, and his mental condition, we think it likely that he would have assessed his strategic position differently had he realized that he was losing the chance to challenge the district court's sentencing decision, which was based primarily on crimes unrelated to the crime of conviction and gave little weight to Sura's individual circumstances. We note as well that the 30-month sentence Sura received (three months less than the low end of the advisory range the judge used) is twice as long as the high end of the 9 to 15-month range that would have applied if the judge had found him eligible for the sporting-use discount. This, too, supports a finding that Sura's substantial rights were affected by the error.

To complete the plain error analysis, we must consider whether this particular error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Again, we find the Sixth Circuit's analysis in *Murdock* persuasive. That court concluded that "[t]he right to appeal, while not of constitutional dimension, . . . is nonetheless of critical importance to a criminal defendant." 398 F.3d at 498. It added that "[w]e agree with the Ninth

Circuit's approach and conclude that, given the 'wholesale failure' to ascertain that Murdock understood the waiver provision, 'the enforcement of the waiver in these circumstances would seriously affect the fairness, integrity and public reputation of our plea proceedings.'" *Id.*, citing *Arellano-Gallegos*, 387 F.3d at 797. Although we enforce knowing and voluntary plea waivers, this court has observed that "there is a risk that appeal waivers do nothing but cut off potentially meritorious arguments . . . for direct appeal." *Whitlow*, 287 F.3d at 642. Responsible counsel, faced with nothing but frivolous arguments for appeal, will choose to file an *Anders* brief, see *Anders v. California,* 386 U.S. 738 (1967), and suggest to the court that an appeal should be dismissed. However, even in those cases, this court has held that if a defendant tells a lawyer to appeal and the lawyer drops the ball, then the defendant has been deprived of his Sixth Amendment right to assistance of counsel. See *Castellanos v. United States,* 26 F.3d 717, 718-19 (7th Cir. 1994). When a lawyer has failed to file notice of appeal upon her client's request, we routinely grant motions under 28 U.S.C. § 2255 and allow the appeal process to go forward. See *Rodriquez v. United States,* 395 U.S. 327 (1969). We conclude, therefore, that Sura's unwitting waiver of his right to appeal seriously affected the fairness of the judicial proceedings.

We note that this outcome may not help Sura in the end. At oral argument, we asked Sura's counsel if Sura was aware that if he prevailed, his plea would have to be set aside and he would lose the benefits of any parts of the plea agreement that benefit him. Counsel assured us that Sura was aware of this risk and nonetheless wanted to set aside his plea.

## III

Because the plea must be set aside, it is possible that Sura may go to trial on remand, or he may reach a new agreement with the government. Either way, it is possible that the same question that Sura is now presenting will

arise again under the Sentencing Guidelines. We therefore offer some observations on those provisions of the Guidelines. As we noted at the outset, in computing the advisory Guideline range, the district court did not give Sura the benefit of U.S.S.G. § 2K2.1(b)(2), which requires a reduction in the recommended sentence if the defendant possessed the firearm solely for "lawful sporting purposes or for collection." The district court thought that Sura was not entitled to this adjustment because he had been told earlier that he was not permitted to possess firearms and because of his record of harassing women.

There is a methodological problem here that must be cleared up in any future sentencing proceeding. Neither reason the court gave is pertinent to the initial computation of Sura's Guideline range. Section 2K2.1(b)(2) would never come into play for a defendant who had the *right* to possess either a firearm or ammunition; thus, the fact that Sura was expressly warned that he should not have these items is beside the point. Sura's unfortunate behavior toward women is even further afield from the Guidelines that address firearms offenses. In any further proceedings, the district court must make a focused factual determination about the use to which Sura put his Beretta (and any other guns that may be at issue once the plea agreement is gone). Application Note 10 to § 2K2.1(b)(2), on which the government relied at Sura's sentencing, does not support the approach that the court took. At the time, that Note read as follows:

> 'lawful sporting purposes or collection' as determined by the surrounding circumstances, provides for a reduction to an offense level of 6. Relevant surrounding circumstances include the number and type of the firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law.

As the Eighth Circuit held in *United States v. Ramirez-Rios*, 270 F.3d 1185, 1187 (8th Cir. 2001), this amounts to saying that "[i]n determining whether § 2K2.1(b)(2) applies, the focus of the inquiry is the 'intended lawful use' [of the firearm]." This court has applied a similar approach to the Guideline and the application note. See *United States v. Lewitzke,* 176 F.3d 1022, 1029 n.7 (7th Cir. 1999) (noting that a defendant previously convicted of domestic violence could be eligible for the reduction).

This is not to say that the district court is precluded from taking factors like the probation officer's warning and Sura's unrelated convictions into account. As the Supreme Court just reaffirmed in *Gall v. United States,* No. 06-7949, 2007 WL 4292116 *7-8 (U.S. Dec. 10, 2007), district judges have broad discretion to choose an appropriate sentence. See also *Rita v. United States,* 127 S.Ct. 2456, 2465 (2007). Courts of appeals then review sentences for reasonableness, using an abuse-of-discretion standard. *Gall,* 2007 WL 4292116 at *2. The factors outlined in 18 U.S.C. § 3553(a) are easily broad enough to allow the district court to consider Sura's individual characteristics, after it has properly computed the advisory Guideline range. See especially § 3553(a)(1). We hold only that, as *Gall* reiterated, the judge must begin with a properly computed Guideline range. 2007 WL 4292116 at *7; see also *United States v. Nelson,* 491 F.3d 344, 347 (7th Cir. 2007); *United States v. Sriram,* 482 F.3d 956, 962 (7th Cir. 2007).

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, *Chief Judge*, dissenting. Sura waived his right to appeal. He appealed anyway, thinking that he could enjoy the benefits of the plea agreement while avoiding its

detriments. Informed at oral argument that this is impossible—that the waiver must be enforced as long as the plea stands, see *United States v. Wenger*, 58 F.3d 280 (7th Cir. 1995)—Sura's lawyer waffled but ultimately told us that his client wants to withdraw the plea and take the risk of a higher sentence if the prosecutor should add charges.

But once a plea has been accepted and sentence imposed, the plea may not be withdrawn unless reversible error has occurred. Compare Fed. R. Crim. P. 11(d) (withdrawal before sentence) with Rule 11(e) (no withdrawal after sentence). Sura never asked the district court for an opportunity to plead anew, even after the judge pronounced a sentence that exceeded his expectation.

Counsel argues that the district judge's failure to follow Fed. R. Crim. P. 11(b)(1)(N) nonetheless allows his client to start over. Rule 11(b)(1)(N) requires the judge to inform the defendant orally about "the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." The district judge failed to comply with this rule. Neither the prosecutor nor defense counsel called the omission to the judge's attention, then or later.

*United States v. Vonn*, 535 U.S. 55 (2002), holds that the plain-error standard governs when a defendant who did not move to withdraw his guilty plea in the district court argues on appeal that the plea was defective because of a district judge's failure to comply with Rule 11(b)(1). See Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725 (1993). *Vonn* also holds that, when conducting plain-error review, a court of appeals must consult the whole record and is not limited to the transcript of proceedings in open court. 535 U.S. at 74–76. *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004), adds that, to demonstrate plain error, "a defendant must show a reasonable probability that, but for the error, he would not have entered the plea." See also *United States v. Arenal*, 500 F.3d 634, 637–39 (7th Cir. 2007).

Sura has not shown that, but for the district judge's

omission, "he would not have entered the plea." Indeed, Sura has never asserted this, let alone "shown" it. Nor does he maintain that district judges' compliance with Rule 11(b)(1)(N), which became effective in December 1999, leads a non-trivial fraction of defendants to balk and refuse to plead guilty. The Committee Note explaining the amendment says that the advice is designed to make a clear record and ensure that pleas are voluntary; but for a defendant who knows about the waiver before appearing in court, a reminder from the bench will not affect the plea. Before assuming (as my colleagues do) that a heads-up from a judge will jolt defendants and alter their decisions to plead guilty (the standard under *Dominguez Benitez*), we ought to know whether this happens frequently, rarely, or never—in either the federal system as a whole or the Eastern District of Wisconsin.

Sura himself has not told us how a statement complying with Rule 11(b)(1)(N) would have affected his decision—not in the district court, not in his appellate brief, and not at oral argument. He has not filed an affidavit describing what he would have done had the district judge followed Rule 11(b)(1)(N), nor has Sura asked for a hearing at which evidence could be adduced.

What Sura would have done is a question of fact. It ought not be resolved by a court of appeals unbidden. Ours is an adversarial system, after all. Contentions never made by one side are never addressed by the other. What justification have we for cutting the prosecutor and district judge out of this process and making a critical finding spontaneously? Just the other day the Supreme Court noted the vital role that a district judge plays in sentencing. See *Gall v. United States*, No. 06–7949 (U.S Dec. 10, 2007). Yet my colleagues leave him with no role to play in finding facts on an issue that *Dominguez-Benitez* makes a *sine qua non* to withdrawing the plea.

If forced to reach a decision without findings or argument—for, to repeat, Sura has never even *asserted* that

he would not have pleaded guilty had the judge complied with Rule 11(b)(1)(N)—I should be inclined to doubt that the district judge's omission made any difference. Here is where *Vonn*'s holding that the court must consider the whole record matters. The advice required by Rule 11(b)(1)(N) could not have made a difference if Sura already knew that his plea agreement waived any entitlement to appeal.

A district judge might affect a defendant's choice by explaining that the right to appeal is worth more than a given defendant believes. If, for example, the plea came after some debatable rulings, a judge's comment that the court of appeals may well take a different view of the subject might dissuade a defendant from promising to forego an appeal. But Rule 11(b)(1)(N)—unlike, say, 18 U.S.C. §3143(b)(1)(B)—does not call on the district judge to evaluate the probability of reversal; all it requires is that the judge ensure that the defendant knows of the plea agreement's contents. If the defendant already has that knowledge, then the judge's repetition will not affect his decision.

The written plea agreement contains Sura's signature immediately under a section (captioned "Acknowledgement") stating that Sura has read the agreement and that his lawyer has explained "every part" of it to him orally. Counsel also signed the agreement immediately under this representation: "I have carefully reviewed every part of this agreement with the defendant." Sura is literate; he has never contended that when he made these representations about what he (and his lawyer) had done, he was lying to the court. Nor has counsel filed an affidavit telling us that he lied when he assured the court and the prosecutor that he explained the agreement to his client.

If either Sura or his lawyer had advanced such an assertion, we would need to decide whether, by recanting, a defendant may obtain a hearing. The usual answer is no,

that both litigants and lawyers are bound by their initial representations made in connection with a guilty plea. See, e.g., *United States v. Peterson*, 414 F.3d 825 (7th Cir. 2005); *United States v. Stewart*, 198 F.3d 984 (7th Cir. 1999); *United States v. Messino*, 55 F.3d 1241, 1248 (7th Cir. 1995); *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir. 1987). In civil litigation courts regularly hold people to their contracts whether they read them or not; why should what is normal in civil cases be deemed a miscarriage of justice in criminal cases? It won't do to reply "because Rule 11(b)(1)(N) requires oral advice"; that tells us that the district judge made an error but does not establish the miscarriage-of-justice component of plain-error review. Omission of an otiose reminder cannot be a miscarriage of justice.

Because Sura has never asserted that he was unaware of the document's contents, we must take it as established that he read the whole agreement, that his lawyer told him both what it says and what it means, and that Sura consequently had actual knowledge of the waiver. My colleagues' conclusion that the written agreement counts for nothing cannot be squared with the holding of *Vonn* that the court must consider the full record, or with the holding of both *Vonn* and *Dominguez Benitez* that the defendant bears the burdens of both production and persuasion. But whether or not we accept the representations to which Sura and his lawyer affixed their signatures, we surely cannot act as if the *opposite* of those assurances were the truth! The most Sura could be entitled to is a hearing at which the state of his knowledge, and his likely response to advice under Rule 11(b)(1)(N), would be explored. Decision on an empty record, bypassing the district judge's role as trier of fact, is insupportable.

My colleagues several times ask whether Sura's plea was "voluntary." That's a red herring. *Wenger* holds that in-court notice about an agreement's waiver clause is not essential to voluntariness. When Rule 11(b) was amended in 1999, that step did not change the meaning of the

Constitution. See also *United States v. Timmreck*, 441 U.S. 780 (1979) (a judge's failure to deliver the advice required by Rule 11 does not spoil a plea's voluntariness). Rule 11 requires district judges to go beyond the constitutional minimum.

Even if there were a "voluntariness" question in this case, however, Sura's knowledge of the agreement's terms would vindicate the plea. That's the point of *Peguero v. United States*, 526 U.S. 23 (1999), which holds that a defendant's actual knowledge of a subject on which the district judge failed to supply information required by a Rule of Criminal Procedure forecloses any challenge based on the Constitution. And, to repeat one last time, Sura has never denied having actual knowledge of the waiver.

In the end my colleagues appear to believe that a district judge's failure to comply with Rule 11(b) should lead to reversal in all but the rare case (such as, for example, a defendant who is a lawyer). How else are we to understand this passage (slip op. 12-13):

> The point of Rule 11(b)(1)(N) is that a signed piece of paper is not enough. Most criminal defendants are not legal experts, which is why Rule 11(b)(1)(N) puts a check in the system in the form of a requirement that the district court explain in plain language what consequences will ?ow from the guilty plea, including (where applicable) the loss of appellate rights. If the safeguard required by Rule 11 is missing, the record must reveal an adequate substitute for it, and the defendant must show why the omission made a difference to him.

This approach, which my colleagues attribute to *United States v. Murdock*, 398 F.3d 491 (6th Cir. 2005), has a respectable history; the Supreme Court said much the same thing in *McCarthy v. United States*, 394 U.S. 459 (1969). But Rule 11(h) was added in 1983 to abrogate *McCarthy*, and decisions such as *Vonn* and *Dominguez Benitez* place on defendants the burden of showing plain error if no one alerted the district court to the problem. A district judge

ought to ensure that the defendant knows about important parts of a plea bargain (this is the sense in which the Rule treats the writing alone as insufficient), but this does not imply that every omission must have affected the decision to enter the plea. There are ways other than oral advice from a judge to show a defendant's consent; this case illustrates the point.

To say that Sura's signature on a written agreement is not dispositive is not to say that the state of his knowledge must be ignored. If Sura were not literate in English, or if his lawyer had filed an affidavit revealing that, despite appearances, Sura did not know of the waiver, then an evidentiary hearing could be held to explore where the truth lies. But to conclude, as my colleagues do, that because Rule 11(b)(1)(N) is designed to place on the record the fact that defendants are aware of waivers, then knowledge of a waiver imparted by other means must be ignored, is to repeat the error that led the Supreme Court to reverse the court of appeals in *Vonn* and *Dominguez Benitez*.

The possibility that the district judge erred in calculating the range under the Sentencing Guidelines does not help Sura. First, whether any error occurred remains unclear (and will remain so until proceedings on remand). Second, this inquiry is exactly what a waiver of appeal blocks. Sura gave up this line of argument in exchange for concessions by the prosecutor. We cannot properly make a waiver's validity depend on acts that post-date the plea's acceptance. See, e.g., *Nunez v. United States*, 495 F.3d 544 (7th Cir. 2007); *United States v. Joiner*, 183 F.3d 635, 644–45 (7th Cir. 1999); *Jones v. United States*, 167 F.3d 1142, 1145 (7th Cir. 1999).

Many circuit judges are attracted to the idea that guilty pleas entered after inadequate advice, whether from the judge or from defense counsel, should be set aside more or less automatically. For a recent example, see *Hoffman v. Arave*, 455 F.3d 926 (9th Cir. 2006) (bad advice given by counsel during plea negotiations is ineffective assistance,

and defendant need not allege or prove that, if the advice had been better, he would have entered a different plea), rehearing en banc denied over a dissent of seven judges, 481 F.3d 686 (9th Cir. 2007), cert. granted under the name *Arave v. Hoffman*, No. 07-110 (U.S. Nov. 5, 2007). But the Supreme Court has a different view, exemplified not only by *Vonn* and *Dominguez Benitez* but also by *Hill v. Lockhart*, 474 U.S. 52, 58 (1985) ("to satisfy the 'prejudice' requirement, [a] defendant [who maintains that ineffective assistance of counsel led to a guilty plea] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").